IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 1:20-cv-00395-RBJ-NRN

HOME BUYERS WARRANTY CORPORATION and
HOME BUYERS RESALE WARRANTY CORORATION, and
2-10 HOME BUYERS WARRANTY OF VIRGINIA, INC.,

    Plaintiffs,

v.

DEBRA SUE "Debbie" GENTRY,
KELLY SUSANNE ROBERSON,
ANASTASIA "Stacey" SANTRONI, and
KIMBERLY AZPEITIA,

    Defendants.

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs seek to enjoin the four defendants from soliciting or accepting business from certain real estate professionals and brokerages in violation of confidentiality/noncompetition terms in their employment contracts. The motion is granted for the reasons and on the terms set forth in this order.

## FACTS

Home Buyers Warranty Corporation and the two related plaintiff companies (collectively referred to herein as "HBW") sell warranties to home builders and purchasers of new homes. As relevant to this case, the warranties, essentially insurance policies, provide the homeowner with coverage for unforeseen problems with major appliances and home systems (such as heating, air conditioning, plumbing, electrical) that occur or are discovered after the sale is concluded. The warranties are typically sold to the homeowner on the recommendation of the real estate

1

professional who represented the buyer. Renewals of the warranties, which typically cover a one-year period, are equally, if not more, important sources of revenue to HBW than the original warranty itself.

HBW expends substantial effort, including the use of proprietary algorithms, to identify licensed real estate professionals within a given territory who are the best prospects to whom to market its services. These prospects are ranked in four categories based on the data developed. This information is provided to salespersons whose job it is to market home warranties within their assigned territories. Using the marketing information provided by HBW as well as any personal contacts they might have, the salespersons develop and cultivate relationships with real estate agents (realtors) who will be good sources of referrals of their customers to HBW. In addition to relationships with individual realtors, HBW enters into joint advertising programs with certain real estate brokerages which encourage their realtors to recommend HBW warranties to their customers. HBW considers the identity of these realtors and brokerages, as well as homeowners who have purchased home warranties from HBW, to be among its most valuable trade secrets.

Each salesperson is required to sign a contract, currently entitled "Sales Professional Confidentiality/Non-Competition Agreement" as a condition of employment. In that contract the salesperson agrees, among other things, to protect and not to disclose HBW's confidential information and trade secrets. *Id.* at ¶1.3. The salesperson also agrees "not to solicit any Covered Customer to terminate a relationship or otherwise cease doing business in whole or in part with [HBW] or interfere with any material relationship between [HBW] and any Covered Customer" within a "Restricted Area" during a "Restricted Period." Plaintiffs' Ex. 2 at ¶ 1.6. The following are definitions of the key terms in these restrictions:

2

- "Covered Customer" includes, among others, clients, customers, real estate agents, and real estate brokers. *Id.* at ⁋1.1.3.
- The "Restricted Area" is the geographic area assigned to the salesperson during the one year immediately preceding the termination of employment plus a 25-mile buffer surrounding that area.
- The "Restricted Period" is the 12-month period immediately following the termination of the salesperson's employment with HBW. *Id.* at ⁋1.1.4. However, "The running of the period of the applicable restrictions in the above subsections 1.3 through 1.9 shall be automatically tolled and suspended for the duration of any breach by Sales Professions [sic] of the applicable restriction and shall automatically recommence when such breach is remedied or cured." *Id.* at ⁋1.10.

Defendants Debra Sue (Aitken) Gentry, Kelly Susanne (Roberson) Montgomery, Anastasia ("Stacey") Santroni and Kimberly Azpeitia were HBW salespersons who signed the foregoing HBW contracts. Ms. Gentry started with HBW in June 2004; Maryland was her assigned territory. Ms. Montgomery started with HBW in July 2009 and was assigned to Northern Virginia. Ms. Santroni began working for HBW in 1999; her assigned territory at the time she resigned was New Jersey, eastern Pennsylvania, and Delaware. Ms. Azpeitia joined HBW in 2018 and was assigned to Houston, Texas.

Ms. Gentry, Ms. Montgomery and Ms. Santroni had become close friends over their years at HBW. According to their hearing testimony, each of them independently decided in late 2019 for a variety of reasons involving perceived mistreatment to leave HBW and take similar positions with Choice Home Warranty, a competitor. Their transition was encouraged by Carolyn Ricketts, a former HBW employee who was working as the Sales Manager at Choice.

3

Having made this decision, the three women agreed to notify HBW of their decisions and to start with Choice simultaneously on January 2, 2020.  In the days preceding their departure each of them emailed themselves various HBW documents.  During the hearing each of them provided benign explanations for having done so, but I did not find their explanations to be entirely credible.

Ms. Azpeitia accepted an offer from Choice on January 29, 2020 and resigned from HBW on January 31, 2020.  She too sent herself a flurry of emails containing business information related to HBW shortly before she left.  She did not know the other three defendants until she met them at Choice.  Ms. Azpeitia is unique in another way relevant to this case – prior to joining HBW she had been a salesperson for another company in the same business, OneGuard Home Warranties, and she had sold home warranties on the recommendation of realtors with whom she had developed relationships while at OneGuard.

Ms. Ricketts actively encouraged the new arrivals to contact the realtors with whom they worked at HBW and try to get them into the Choice fold.  For example, in an email to Ms. Santroni and Ms. Montgomery sent on their first day, Ms. Rickets listed the "most important thing[s]" for them to do upon arriving at Choice.  The first three items on the list were:

> 1.  Call every manager of every office you were working with and let them know – then follow up with an email and a pdf of our brochure.  Ask for a face to face meeting and permission to put your new supplies in their office.
>
> 2.  Call every agent who has been working with you – ditto on above!
>
> 3.  If you have a spreadsheet of agents with contact info – we can get them entered into our internal system and transferred over to your Constant Contact account.  If you don't – ask every manager for a spreadsheet with their roster – explain that by entered [sic] the agents in now – when they order from us the process will go much quicker.

Plaintiffs' Ex. 23.

The Court does not know the full extent to which the four defendants have solicited the realtors and brokerages with whom they had relationships at HBW since they joined Choice; or the number of sales of Choice home warranties they have made on recommendations of those realtors and brokerages; or the number of HBW homeowner customers who have purchased Choice warranties rather than renewing HBW warranties. However, there is no doubt that such solicitation and sales have occurred.

For example, Ms. Santroni acknowledged that during her first week at Choice she targeted three brokerages with who HBW had advertising programs in place: Rauh & Jones, Patterson Schwartz, and RE/MAX Community. She and Ms. Ricketts met with at least Patterson Schwartz in early January 2020. Notably, both parties have referenced a list that shows the people with whom each defendant has worked at Choice and how many of those people had relationships with HBW. In her testimony Ms. Santroni stated that 31 out of 165 clients on her Choice list were former HBW clients, i.e., they make up about 19 percent of her Choice clientele. Similarly, Ms. Montgomery acknowledged that about 30 percent of her current book of business with Choice was previously with HBW.

For present purposes, it suffices, and the Court finds, that the defendants brought with them to Choice their knowledge of the specific realtors and brokerages with whom they had working relationships at HBW; they were encouraged and directed by their Sales Manager at Choice to solicit those realtors and brokerages; and they did so. Some, if not all, of the four defendants have significant books of business at Choice in addition to their former HBW clients. Nevertheless, the fervor with which defendants have opposed the entry of an injunction attests to the importance they attach to the relationships developed at HBW that they are now exploiting at Choice.

## CASE HISTORY

Plaintiffs filed their Complaint in this case on February 14, 2020, accompanied by a motion to expedite discovery. ECF Nos. 1 and 2. Plaintiffs' First Amended Complaint was filed on February 18, 2020. ECF No. 5. Their Second Amended Complaint was filed on April 3, 2020. ECF No. 22.

The pending motion for a preliminary injunction was filed on June 27, 2020. ECF No. 44. The Court held a hearing on the motion on July 21, 2020, but it was not completed and was continued to August 7, 2020. *See* ECF Nos. 59. However, before the second phase of the hearing the parties informed the Court that they had negotiated a tentative settlement, and the August 7 setting was vacated. Unfortunately, their settlement negotiations broke down. At the parties' request the Court referred the case to United States Magistrate Judge N. Reid Neureiter for a settlement conference. ECF No. 68. The settlement conference, held on August 3, 2020, was not successful.

The Court then reconvened the preliminary injunction hearing on September 15, 2020. *See* ECF No. 88. The parties still did not complete their presentations. The defendants thereafter submitted the deposition of Eduard Kats as a stipulated exhibit, and at the parties request, the Court held closing arguments on September 22, 2020. But even then, the hearing was not completed. Plaintiffs had filed a restricted document containing lists of the real estate professionals that each of the four defendants purportedly were working with at HBW in 2019. ECF No. 92. These lists are what HBW referred to as "Exhibit A" in its first and second proposed forms of a preliminary injunction order, ECF Nos. 44-1 and 70-1, although the actual lists were not attached to the proposed order at that time. During closing arguments defense counsel pointed out that the lists had never been formerly offered and admitted as exhibits during

6

the hearing. However, defendants declined to stipulate that the document does in fact represent their HBW realtor lists.

The Court could have issued this order with only a generic description of the realtors whom the defendants cannot work with under the terms of their contracts. Except as I will note herein, neither the lists nor the identity of the realtors and brokerages on them are new or unknown to the defendants. However, I believed (as do the parties) that future disputes are more likely to be avoided if those whom I will sometimes refer to as the "prohibited" real estate professionals and brokerages are specifically identified. Therefore, the Court reopened the evidence for the sole purposes of dealing with the document containing the lists, and that resulted in the fourth session of the preliminary injunction hearing, held on October 9, 2020.

## DISCUSSION

To obtain a preliminary injunction plaintiffs must show that (1) they are substantially likely to succeed on the merits; (2) and will suffer irreparable harm without the injunction; (3) their injury outweighs the injury to the defendants if an injunction is entered; and (4) the injunction is not contrary to the public's interest. *See, e.g., Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 797 (10th Cir. 2019).

### A. **Likelihood of Success on the Merits.**

HBW is a Colorado-based company. The defendants' contracts provide, and the parties do not dispute, that Colorado law governs their enforceability. Under Colorado Revised Statutes § 8-2-113(2),

> Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to: . . . (b) Any contract for the protection of trade secrets.

I find that the subject contracts are covenants not to compete and are governed by the statute. Even if a contract is not void under this section, it is enforceable only if it is reasonable in duration and geographic scope. *See, e.g., Reed Mill & Lumber Co. v. Jensen,* 165 P.3d 733, 736 (Colo. App. 2006).

Defendants do not argue that the duration of the confidentiality/non-compete provisions of the contract is unreasonable, although they argue that the Court should not apply the tolling provision of § 1.10 of the contracts. I will address that provision later in this order. However, I conclude that the duration of the defendants' contracts is reasonable.

Defendants do challenge the geographic scope of the contracts. They note that the specific contours of their respective territories is not defined in their contracts, and they also dispute the 25-mile buffer surrounding their territories. I reject the first argument; these defendants knew what their assigned territories were. However, I agree with the defendants that the 25-mile buffer is unexplained in the contracts, was neither explained nor defended during the hearing, appears to be arbitrary, and is therefore, unreasonable. Defendants contend that because the 25-mile buffer is unreasonable, it follows that the geographic scope is unreasonable, and the contracts are rendered unenforceable in their entirety. I disagree. That argument undermines the severability provision of the contracts. *E.g.* Ex. 2 at 4, ¶4. Consistent with the severability provision, the Court severs the 25-mile buffer provision, and having done so, finds the contracts are reasonable in geographic scope.

The primary focus of the dispute is on whether the contracts that would otherwise be void under Colo. Rev. Stat. § 8-13-113(2) are contracts for the protection of trade secrets and are therefore enforceable. Defendants argue that this case is not about trade secrets because the identities of realtors and brokerages in the various territories in which HBW does business are

8

not secret; they are easily found with a simple Google search. The argument misses the point. It is the identity of the specific realtors and brokerages with whom HBW established working relationships by means of its research and the work of its sales force that is the trade secret.

The Colorado Uniform Trade Secrets Act defines the term "trade secret" in relevant part to include "confidential business or financial information, listing of names, addresses, or telephone numbers, relating to any business or profession which is secret of value." Colo. Rev. Stat. § 7-74-102(4). This definition has been applied to customer lists: "A customer list can be a trade secret when it is the end result of a long process of culling the relevant information from lengthy and diverse sources, even if the original sources are publicly available." *Hertz v. Luzenac Group,* 576 F.3d 1103, 1114 (10th Cir. 2009). That is what we have in substance here. The ultimate customers of HBW are the homeowners who buy and renew home warranties, but because these customers are referred to HBW by realtors, the realtors and brokers are effectively HBW's customers. I conclude that the identity of the realtors and brokerages who referred customers to HBW for home warranties was a trade secret of HBW.[1]

Defendants point out that they brought or assisted in bringing some of the relationships to HBW. For example, one of Ms. Santroni's jobs before she joined HBW was as a realtor for Fox & Lazo Realtors, the predecessor of Fox & Roach Realtors, which today is known as Berkshire Hathaway Home Services Fox & Roach Realtors. This is a large, multi-office real estate brokerage doing business in New Jersey, Pennsylvania and Delaware. After Ms. Santroni was hired by HBW she still had many contacts at Fox & Lazo, and she used those contacts to help pitch the brokerage and bring it into the HBW fold. The other defendants similarly drew on contacts with family and friends to develop business for themselves and HBW when they could.

---

[1] In his deposition Choice's corporate representative Mr. Kats acknowledged that Choice maintains the confidentiality of its similar lists, although he declined to attach the label "trade secrets" to them.

9

But using pre-existing relationships to develop and maintain business relationships for HBW is one thing an HBW salesperson is expected to do. The fact that a salesperson is successful at the task does not make the identity of the realtors, brokerages and homeowners developed with their assistance any less an HBW trade secret even if they were not targeted by HBW's algorithm-driven research or under the umbrella of a joint advertising program.[2]

The bottom line is that Choice's advice that the defendants could ignore their undertakings under their HBW confidentiality agreements because those agreements were not enforceable was bad advice. I conclude that plaintiffs are substantially likely to succeed on the merits of their claim for permanent injunctive relief in this case.

### B. Irreparable Harm.

The exposure of carefully guarded trade secrets is an irreparable harm. Once the list is in the hands of a competitor, it cannot totally be removed from the customer's knowledge. Once the customers are lost to the competitor they are lost. Indeed, in section 2 of the subject contract defendants stipulated that violations would cause irreparable injury, that money damages alone would not adequately compensate HBW, and that injunctive relief is "the only fully effective remedy."

Defendants offer two arguments in response. First, they argue that HBW waived its rights by failing promptly to seek a temporary restraining order or a preliminary injunction. I disagree. Within a week after Ms. Gentry left, HBW reminded her of her obligations under her contract. Ex. 35 (January 9, 2020 letter of Michael Fletcher, Vice President, General Counsel & Secretary). Similar letters were sent on the same day to defendants Santroni and Montgomery.

---

[2] I exclude any realtors and brokerages through which defendant Azpeitia sold home warranties during her previous employment by OneGuard. It is hard to see how a relationship of that nature that she developed before she arrived at HBW and continued to maintain during the short period she worked for HBW could be viewed as HBW's trade secret.

Ex. 33 and 37.  Defendant Azpeitia, whose last day at HBW was January 31, 2020, was sent a similar letter on February 3, 2020.  Ex. 66.  HBW filed its Complaint for injunctive relief and damages on February 14, 2020, approximately six weeks after the first three defendants went over to Choice and two weeks after they were joined by Ms. Azpeitia.  Their complaint prays for injunctive relief to prevent defendants from disclosing or using HBW trade secrets.

Also, on February 14, 2020 plaintiffs moved for expedited discovery "to determine the nature and extent of the Departed Employees' misappropriation of HBW's Confidential Information and Trade Secrets, as well as to preserve material evidence. ECF No. 2.  The Court granted the motion for expedited discovery on March 26, 2020, after counsel fulfilled their duty to confer.  *See* ECF Nos. 12 and 21.  Following expedited discovery plaintiffs filed the pending motion for preliminary injunction on June 27, 2020 and requested an evidentiary hearing.

The Court held the hearing on July 21, 2020.  However, the hearing was not concluded, and the parties then went through a period of attempting to settle the matter during which they thought they had a settlement.  When that failed, the Court set the continuation of the preliminary injunction hearing on September 15, 2020.  Even then, the hearing was not concluded, and it was not finally concluded until October 9, 2020.  Could plaintiffs (and the Court) have proceeded more expeditiously?  Probably, but given the need for early discovery and the scheduling difficulties that have plagued parties and courts during the pandemic, I do not find that HBW has waived its right to injunctive relief.  After all, defendants knew within a few days after they left HBW that HBW insisted on their honoring their contracts.  They knew at least from February 14, 2020 that HBW was accusing them of violating their contracts and was seeking injunctive relief in court.  Any breaches of their contracts after they were warned, and especially after they were sued, were at their own risk.

11

Second, defendants note that the Complaint, as amended, seeks both injunctive relief and damages, effectively showing that the alleged harm is compensable by money. I am not persuaded. As noted above, defendants themselves stipulated to the contrary in their contracts. Presumably the only available remedy for any harm caused by defendants' breaches to date is money damages. The Court cannot unscramble the eggs. But that does not mean that continuing use of HBW's trade secrets does not constitute irreparable harm. Virtually by definition, the misappropriate of trade secrets causes irreparable harm.

### C. Comparison of Injuries.

No doubt the inability to work with realtors and brokerages with whom the defendants had relationships will be harmful to them. As Ms. Ricketts implicitly recognized, those relationships were a large part of what these women had to offer Choice. But that was the deal they accepted at HBW. To the extent the defendants are now potentially facing monetary remedies to compensate sales achieved with the assistance of those realtors and brokerages, they brought it on themselves. Fortunately, their books of business at Choice extend beyond their HBW relationships, and even those relationships will be fair game once the restricted period is completed.

In contrast, HBW has had its trade secrets delivered to a competitor. It may or may not be able to collect money damages from the individual defendants, but it can't get its misappropriated trade secrets back. If it did not seek and obtain injunctive relief it would essentially be inviting other salespersons to similarly disregard their contracts. I draw the balance of the injuries in favor of the employer in this case.

### D. Public Interest.

Colorado law makes it plain that restrictive covenants that prevent employees from working are presumptively void. However, it is just as plain that if a confidentiality agreement is reasonable in duration and scope, and if it is reasonably necessary in order to protect trade secrets, it is enforceable. The statute essentially defines the public interest involved.

### SCOPE OF REMEDY

The parties have raised several concerns about the remedy which I will address here.

1. Soliciting or accepting. HBW has proposed an order that prohibits defendants from "soliciting *or accepting* business" from the subject realtors and brokerages, *see* ECF No. 70-1 (emphasis added). Defendants argue that the words "or accepting" would be re-writing the contract, and that they should not be precluded from doing business with any real estate professional who contacts them first. HBW responds that this would make the remedy unenforceable.

The relevant contractual language states that during the restricted period, the salesperson "will not, directly or indirectly, on his or her behalf or on behalf of any other entity or person, contact, induce, solicit any Covered Customer…." Ex. 2 at ¶1.6. I am bound by the plain language of the contract. However, it is broader than merely to prohibit soliciting. It prohibits the defendants from doing indirectly what they cannot do directly. The enforcement will come from discovery to be taken from the defendants, and from Choice, and potentially from the prohibited real estate professionals with whom they might do business during the restricted period. Given the potentially serious consequences of being found in contempt of a court order, I would not recommend that the defendants parse words or find some clever means of

13

circumventing the contract and this Court's order, such as by subtlety letting it be known (or having others let it be known) to the prohibited real estate professionals that they can't initiate contact with them but are free to accept referrals so long as those professionals make the first move. Essentially, the defendants are instructed to keep their hands off those professionals during the restricted period.

2. <u>The restricted period</u>. The restricted period for three of the defendants began on January 2, 2020, and for Ms. Azpeitia on January 31, 2020. However, under § 1.10 of their contracts, the running of the restricted period was "tolled and suspended for the duration of any breach by Sales Profession[als] of the applicable restriction and shall automatically recommence when such breach is remedies or cured." Defendants argue that that this tolling provision is unenforceable, citing the Tenth Circuit's table opinion in *Equifax Services, Inc. v. Hitz,* 968 F.2d 1224 (10th Cir. 1992) (unpublished). This unpublished opinion is not binding precedent. Moreover, it was decided under Kansas substantive law, and the facts are somewhat different from the present facts. Nevertheless, I am persuaded by its reasoning that the tolling provision is not enforceable in the circumstances of the present case.

In *Equifax Services* in his employment agreement plaintiff agreed that he would not serve the employer's customers in states in which he had operated as a branch manager for two years following termination of his employment. *Id.* at *1. He agreed that in the event of a breach the employer could seek injunctive relief in addition to other remedies. The agreement also provided that in the event of a breach the duration of the covenant not to compete would be extended beyond the two-year period for a time period equal to the duration of the breach. *Id. at *5.*

14

The employee resigned his employment and, according to the employer, set up a competing business and began to service the employer's customers in violation of the covenant not to compete. The employer filed suit and sought both damages and injunctive relief. The district court first granted a temporary restraining order followed by a preliminary injunction enjoining the employee from violating the covenant. The court also held a two-day bench trial, after which it awarded $605,000 in damages against the employee. On appeal the employee argued that it was duplicative to award both injunctive relief and damages. The panel disagreed. Notably, it stated:

> The district court did not award both injunctive relief and damages. The court refused to extend the previously imposed injunctive relief, in accordance with the employment agreement, because it did award damages. The district court ruled that the damages awarded to Equifax were "for the period during which the defendant was in breach of contract, . . . ." No error was committed. The purpose of injunctive relief is to prevent future violations.

*Id.*

In the present case HBW's counsel had made it clear that they are seeking damages from the defendants for the breaches that have occurred between the termination of their HBW employment and the issuance of the injunction granted by this order.[3] Although the damages portion of this case has yet to be tried, I have no reason to believe that HBW will not be entitled to such damages as they can prove resulted from defendants' breaches during the period January 2, 2020 to the date of this order. To permit both the award of damages for this breaching conduct and to use the same breaching conduct to extend the restricted period would effectively result in duplicative relief. As the Tenth Circuit panel put it, the purpose of the injunctive relief is to prevent future violations, but the remedy for the past violations is in damages.

---

[3] HBW is also seeking damages against plaintiff's new employer, Choice, in a separate lawsuit pending in federal court in New Jersey.

15

Accordingly, the Court holds that the restricted period will terminate on January 2, 2021 (January 31, 2021 for defendant Azpeitia). I understand that this result, coming when it does in this particular case, effectively eliminates the injunctive remedy for approximately nine of the twelve months applicable to these defendants. Nevertheless, because HBW has chosen to seek damages for the breaches during the last nine months – as is its right – I conclude that this result provides an appropriate remedy without duplication or extending the restricted period to what could be viewed as an unreasonable duration.

3. Audit. Plaintiff has proposed as an enforcement mechanism that defendants be required, at their expense, to provide certain information to a neutral third party accounting firm to determine and report on any violations of this Order. There is nothing in the contract about such an audit, nor in any event do I find it to be necessary. The issuance of a preliminary injunction is just the first phase of litigation that will ultimately culminate in a permanent injunction hearing and a damages trial. HBW should have the ability through investigation and discovery to uncover violations. Perhaps more importantly, the potential consequences of a contempt finding, which could include attorneys' fees or other monetary sanctions or even incarceration for egregious violations, are of such severity that I frankly doubt that the defendants will have much appetite for noncompliance with the order during the next three months.

4. Bond. HBW urges the Court not to require the posting of a bond, claiming that its likelihood of success on the merits is very high, and that an interim injunction will not cause any harm other than prohibiting unfair competition. *See* ECF No 44 at 3. However, anytime a noncompete clause is upheld in Colorado there is a chance that an appellate court will disagree.

And, if it were error to enjoin defendants from serving some of their potentially most lucrative real estate customers, the harm could be substantial.

Defense counsel estimated that defendants earn roughly $50,000 a year, and because he was assuming that the injunction would only last three months, he suggested that the bond be one fourth of that, i.e., $50,000 total. I accept that as a reasonable amount and set bond at $50,000, cash, property or surety. The injunction will become effective upon the posting of a bond approved by the Court.

5. "Exhibit A." On October 9, 2020 plaintiffs filed a revised Exhibit A, ECF No. 97, as a restricted document. This 95-page document lists all real estate professionals and brokerages who referred homeowners to HBW in 2019 within the defendants' respective territories and for which defendants received commissions on the sales of home warranties to those homeowners. Defendants do not dispute that the list is what it purports to be. However, each defendant has identified real estate agents on the lists whom they had no relationship, i.e., whom they believe they never even met. Ext. MM (Gentry), NN (Montgomery), OO (Santroni) and PP (Azpeitia). Plaintiffs' counsel explained that this could result from presentations to brokerages where the defendant might not have met all the attendees but nevertheless received referrals. Apparently, defendants would receive commissions for any purchases of home warranties within their respective territories regardless of the reason that the sale occurred.

The odd thing is that defendants have testified that not only did they have no relationship with the individuals on these shorter lists, but they have not pursued a relationship with any of them during 2020 and have no desire or intention to do so. In short, the defendants do not care whether they are restrained from soliciting or contacting those persons. By the same token, HBW's case is based largely on the relationships these defendants had with real estate

professionals as a result of the combined efforts of HBW and the defendants. The individuals listed in exhibits MM through PP don't fit that mold. But these parties could not bring themselves to agree even as to these realtors. The Court orders that the individuals listed in exhibits MM through PP are figuratively excised from "Exhibit A."

## ORDER

1. Plaintiffs' motion for a preliminary injunction, ECF No. 44, is GRANTED.

2. Effective on the posting of a court-approved bond, and continuing through January 2, 2021, defendants are preliminarily enjoined as follows:

 a. Defendants may not, directly or indirectly, on their own behalf or on behalf of any other entity or person, contact, induce or solicit any real estate professional within their 2019 HBW territory through whom they sold one or more HBW home warranty policies during calendar year 2019. The list of prohibited real estate professionals, also called "Exhibit A," is a public access restricted document found at ECF No. 97. The individuals listed in defendants' exhibits MM, NN, OO and PP are excluded from Exhibit A.

2. Defendants may not, directly or indirectly, on their own behalf or on behalf of any other entity or person, contact, induce, or solicit any agents working at a real estate brokerage with which HBW had an exclusive advertising/marketing/sponsorship relationship and through which defendants sold one or more home warranty policies during calendar year 2019. The list of such prohibited brokerages is included in the same Exhibit A.

3. To any extent they have not already done so, defendants are ordered to return all HBW documents, computers, and other confidential business information that they took when they terminated their employment, including but not limited to all copies of documents related to

HBW that they emailed to themselves in the days and weeks preceding the termination of their employment.

DATED this 13th day of October, 2020.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge

19